Case 1:20-cr-00017-CCB   Document 29   Filed 08/11/20   Page 1 of 20

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

LJW/CMR: USAO#2020R00017

2020 AUG 11  PM 1: 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

CLERK'S OFFICE

BY_____ _____DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. CCB-20-017 |
| v. | (Conspiracy to Commit Offenses Against the United States, 18 U.S.C. § 371; Conspiracy to Deprive Civil Rights, 18 U.S.C. § 241; Destruction, Alteration, or Falsification of Records in Federal Investigations, 18 U.S.C. § 1519; and False Declarations Before a Grand Jury, 18 U.S.C. § 1623(a)) |
| ROBERT HANKARD, | |
| Defendant | |



## SUPERSEDING INDICTMENT

The Grand Jury for the District of Maryland charges that at all times relevant to this superseding indictment:

### COUNT ONE
(Conspiracy to Commit Offenses Against the United States)

#### Introduction

1. The Baltimore Police Department ("BPD") was an agency of the State of Maryland whose law enforcement jurisdiction includes Maryland's largest city, Baltimore.

2. Sworn members of the BPD must abide by the Law Enforcement Officer's Code of Ethics, which provides, in pertinent part:

> As a Law Enforcement Officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation; the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice. Honest in thought and deed both in my personal and official life, I will be exemplary in obeying the law and the regulations of my department … I recognize the badge of my office as a symbol of public faith and I accept it as a public trust to be held so long as I am true to the ethics of police service.

3. ROBERT HANKARD ("HANKARD") joined the BPD on December 18, 2007. HANKARD was promoted to Detective on March 20, 2014.

4. In 2014 and 2015, HANKARD served on a Special Enforcement Section (SES) unit assigned to the BPD's Western District. Detective C.V. was HANKARD'S partner in the SES unit. Sergeant K.G. was the officer-in-charge of the SES unit. The offices of the SES unit were at a BPD facility referred to as "the Barn" in Northwest Baltimore. The SES unit and other BPD units that it worked with investigated narcotics offenses, firearms offenses and other offenses and routinely presented cases to federal law enforcement authorities for prosecution in federal courts.

### March 26, 2014, BB Gun Planting

5. On the evening of March 26, 2014, HANKARD, who was not on duty that day, was at his home in Baltimore City when he received a phone call from C.V. C.V. was working that evening with K.G.

6. C.V. told HANKARD that Sergeant W.J. had been "hemmed up" in something and asked HANKARD if he had any "toys" or "replicas" which HANKARD understood to be a reference to a BB gun or air soft gun. HANKARD understood that C.V. was asking for a BB gun so that it could be planted on a suspect.

7. HANKARD told C.V. that he had a BB gun.

8. C.V. then came to HANKARD's house and HANKARD provided him with a BB gun.

9. C.V. took the BB gun and gave it to K.G. who subsequently planted it at the scene of the arrest of D.S. Sergeant W.J. had run over D.S. after chasing him. No guns or drugs were recovered from D.S. at the time of his arrest.

10. D.S. was taken from the scene of his arrest to a hospital, in custody, where drugs were recovered from him. He was then taken from the hospital to BPD's Central Booking

facility where he was charged. Those charges included possession, use and discharge of a gas or pellet gun, for the BB gun that was planted at the scene of D.S.'s arrest, and a number of drug offenses.

11. D.S. was detained on those charges until at least April 2, 2014.

12. The charges against D.S. arising out of his arrest on March 26, 2014, were disposed of by *nolle prosequi*, which is a form of dismissal, on January 16, 2015.

### March 2, 2015, Entry at Cross Keys Apartments

13. In the afternoon of March 2, 2015, HANKARD, C.V. and other BPD officers arrested I.R. in the 5100 block of Falls Road in Baltimore City. I.R.'s keys were taken from him.

14. HANKARD and other officers then went to Apartment A at 15 Cross Keys Road which I.R. had been seen leaving earlier in the day. I.C. lived in Apartment A with her daughter.

15. HANKARD used one of the keys that had been taken from I.R. to open the door to Apartment A. I.C. had recently given I.R. this key.

16. HANKARD and the other officers, including Sergeant J.L., entered the apartment. No occupants were present when the officers entered the apartment. Once inside, HANKARD searched a bag that he found inside of a closet. The bag contained a quantity of gel caps which contained heroin, two digital scales, three sifters and other drug paraphernalia.

17. HANKARD had not obtained a search warrant prior to entering the apartment or searching the bag.

18. After opening the bag that contained drugs, HANKARD left 15 Cross Keys and returned to the SES unit's offices at the Barn to prepare a search warrant for Apartment A.

19. Several BPD officers remained inside Apartment A when HANKARD left. One of those officers called I.C. and asked her to return, which she voluntarily did. I.C. then waited inside the apartment with the officers.

20. In the evening of March 2, 2015, HANKARD appeared before a judge in the Circuit Court for Baltimore City and swore out the search warrant that he had prepared after entering Apartment A.

21. In the search warrant affidavit, HANKARD falsely claimed the following:

> Your affiant [HANKARD] then responded to 15 Cross Keys Road to try the house key recovered from [I.R.] to try the key to the door that he was observed coming out of. Your affiant tried the key on the locks of 15 Cross Keys Road, Apartment #15A. The key fit and turned the locks. The *exterior* of #15A was then secured by Cease Fire Detectives.

(emphasis added).

22. In addition to the false statement that the "exterior" of Apartment A was secured, nowhere in his affidavit did HANKARD disclose that he and other detectives had entered Apartment A prior to obtaining a search warrant, nor did HANKARD disclose that he had opened a bag containing gel caps with heroin, scales, sifters, and other paraphernalia prior to preparing a search warrant.

23. HANKARD then went back to Apartment A, where the other officers had been waiting with I.C. in anticipation of HANKARD returning with a search warrant.

24. During the execution of the search warrant, the bag that HANKARD had previously searched was seized along with its contents.

25. I.C. was arrested after the seizure of these drugs and I.R., who was already in BPD custody when they were recovered, was ultimately charged with drug offenses related to their seizure.

26. Following the execution of the search warrant, HANKARD authored an official BPD "Incident Report" and "Supplement Report" with "CDS Violation" in box 1 of the report and bearing a complaint number ending in 478 that described both the arrest of I.R. and the search of Apartment A. HANKARD signed the Incident Report under the following attestation: "I affirm and declare that the statements made above are true to the best of my knowledge."

27. In the aforementioned report, HANKARD made the same false claim he had made in the search warrant affidavit for Apartment A, namely, that:

> Your affiant [HANKARD] then responded to 15 Cross Keys Road to try the house key recovered from [I.R.] to try the key to the door that he was observed coming out of. Your affiant tried the key on the locks of 15 Cross Keys Road, Apartment #15A. The key fit and turned the locks. The *exterior* of #15A was then secured by Cease Fire Detectives.

(emphasis added).

28. In addition to the false statement that the "exterior" of #15A was secured, nowhere in his report did HANKARD disclose that he and other officers had entered Apartment A prior to obtaining a search warrant, nor did HANKARD disclose that he had opened a bag containing gel caps with heroin, scales, sifters, and other paraphernalia prior to preparing a search warrant.

29. The approving supervisor for this report is listed as Sergeant J.L. and a signature appears next to his name. This is not, however, Sergeant J.L.'s signature.

30. HANKARD also authored an official BPD "Incident Report" and "Supplement Report" bearing a complaint number ending in 618, which only described the search of Apartment A. The approving supervisor for this report is also listed as Sergeant J.L. and Sergeant J.L. signed this report. In this report, however, HANKARD changed his description of

the events leading up to the execution of the search warrant, the new description obscuring whether officers actually entered the apartment prior to HANKARD obtaining the search warrant:

> Detective Hankard then used that key to try the door to unit 15-A. Once it was discovered the key worked on the door lock to Unit 15-A, Detective Sergeant [J.L.] and Detective [] *secured the dwelling* to assure additional evidence would not be destroyed.

(emphasis added)

### September 24, 2015, Arrest at 1401 Bloomfield Avenue

31. On September 24, 2015, HANKARD directed a group of BPD officers, including C.V. and K.G., to a motel in Baltimore City. The target of an investigation of HANKARD's, D.B., was staying at that motel at the time.

32. Once on the scene, HANKARD and C.V. arrested D.B. as he sat in his pickup truck in the motel's parking lot.

33. When HANKARD and C.V. searched D.B.'s pickup truck after removing D.B. from it, no drugs were found.

34. Other officers on the scene, including K.G., then went into motel room 237, where D.B. had been staying. They did so without a warrant. Inside room 237 the officers discovered a female, B.J., a large quantity of heroin that had not yet been packaged for distribution, and a small quantity of cocaine that had already been packaged for distribution.

35. B.J. was then brought from room 237 to the parking lot where HANKARD was waiting with D.B.

36. When K.G. learned from HANKARD that no drugs had been recovered from D.B.'s pickup, K.G. returned to room 237 and took some of the cocaine that had already been packaged for distribution.

37. K.G. then took the cocaine to the pickup truck and asked HANKARD if he was "okay" with K.G. planting the cocaine in the pickup in order to justify the arrest of D.B. and the subsequent entry into his motel room. HANKARD agreed. K.G. then planted the cocaine in D.B.'s truck, where it was subsequently recovered by another BPD officer.

38. D.B. and B.J. were then transported from the motel to the Barn where they were interrogated.

39. HANKARD also returned to the Barn to write a search warrant for room 237.

40. In the early morning hours of September 25, 2015, HANKARD appeared before a Judge of the District Court for Baltimore City and swore out a search warrant for room 237.

41. In the sworn search warrant, HANKARD falsely claimed the following:

   a. At 6:20 p.m., when C.V. approached D.B.'s pickup, C.V. "observed in plain view, a clear tied bag, that contained small zip lock bags (with red dice logo) of suspected cocaine (after opening the clear bag, it revealed 10 ziplock bags total)."

   b. "During the investigative stop of the F150 and [D.B.] a package of suspected cocaine was observed being thrown to the floorboard by [D.B.], confirming the illegal [Controlled Dangerous Substances] activity."

   c. "Detectives then went to Room 237 to secure the outer perimeter for a search warrant. Detectives then used the Motel [] Key card that was recovered from [D.B.], search incident to arrest, in order to see if the card went to the room and to confirm that it was still active. The card was swiped by Detectives and the light turned green and activated the door . . . The door to Room 237 was then secured pending a search warrant."

   d. "Your Affiant believes that [D.B.] went into Room 237 to retrieve the pack of suspected cocaine to sell in the parking lot of the Motel []." (emphasis in original)

42. Further, in the warrant, HANKARD swore that, "Your Affiant *believes* there is additional suspected CDS (in large quantities) inside of Room 237 based on Your Affiant's training, experience, prior investigations, and recent information obtained." (emphasis added). Rather than a belief, HANKARD knew there was a large quantity of heroin in room 237 because he knew BPD officers had already gone into the room and observed it, a fact he omitted from the warrant.

43. At 2:55 a.m. on September 25, 2015, HANKARD returned to the motel with the search warrant and entered Room 237 where other officers had been waiting.

44. Subsequent to these events, HANKARD authored an official BPD "Incident Report" concerning the arrest of D.B., B.J. and the search of Room 237. C.V. approved the report as the "Officer-in-Charge" at the time of the arrests and search, despite the fact that K.G. had been on the scene and was the SES unit's Sergeant at that time. Both HANKARD and C.V. signed the report under the following attestation: "I affirm and declare that the statements made above are true to the best of my knowledge."

45. In the report, HANKARD falsely claimed that:

   a. "... At 18:20 hours ... [when Detective C.V. approached D.B.'s pickup], Detective C.V. observed in plain view, a clear tied bag, that contained small zip lock bags (with red dice logo) of suspected cocaine (after opening the clear bag, it revealed 10 ziplock bags total)."

   b. "... [following D.B.'s arrest] Detectives then went to Room 237 to secure the outer perimeter for a search warrant. Detectives then used the Motel [] Key card that was recovered from [D.B.], search incident to arrest, in order to see if the card went to the room and to confirm it was still active. The card was swiped by Detectives and the light turned green and activated the door. While at the entry door Detectives could smell a very strong odor of rotten vinegar while at the door. Detectives knew from experience in controlled dangerous substances investigations that raw uncut heroin emits a very potent vinegar-like smell, stronger than actual vinegar. The door to Room 237 was then secured pending a search warrant."

46. HANKARD also authored a "Supplement Report" which purported to describe the execution of the search warrant at room 237. C.V. again approved the report as the "officer-in-charge." In this report, HANKARD falsely claimed that:

> "At 0255 hours the warrant was executed using a key card that was obtained, search incident to arrest of [D.B.] on September 24, 2015. During the execution [B.J.] was on the bed and placed in custody."
>
> "Detectives secured the location at 03:15 hours. Both [D.B.] and [B.J.] were transported to the Special Enforcement Section Office for routine debriefing."

47. D.B. was charged with possession with intent to distribute narcotics in violation of Maryland Code Title 5 Subtitle 6 § 5-602 and pled guilty. He was sentenced on August 12, 2016, to 10 years of incarceration, 8 years and 6 months of which was suspended, and was sentenced to 3 years of supervised release.

### March 1, 2017, Arrests of the Members of the Gun Trace Task Force

48. On March 1, 2017, W.J. and six other officers who had been members of the BPD's Gun Trace Task Force ("GTTF") were arrested on federal racketeering charges. Thereafter, it became public that multiple GTTF defendants were cooperating and providing information to the United States in an ongoing investigation.

49. In or around January 2018, K.G. and C.V. arranged to meet in person to discuss the March 26, 2014, BB gun planting. In order to avoid detection, they arranged the meeting using their wives' cell phones.

50. C.V. went to a YMCA near K.G.'s home in Pennsylvania. They had arranged to meet at a swimming pool to ensure that neither one of them had a recording device on him. Once K.G. and C.V. were in the pool they discussed the March 26, 2014, BB planting episode. They discussed HANKARD's involvement in the episode and agreed that

HANKARD and C.V. could falsely deny having any involvement in procuring the BB gun for K.G. if they were approached by law enforcement and asked about the incident.

51. They also discussed alerting one another if approached by law enforcement and discussed the need to "get [their] stories together."

### February 13, 2019, Appearance Before a Grand Jury

52. On February 13, 2019, HANKARD testified before a federal Grand Jury sitting in Baltimore. The Grand Jury was investigating allegations that the BB gun recovered at the scene of D.S.'s arrest had been planted by law enforcement. HANKARD had previously testified under oath during his career as a police officer on numerous occasions.

53. HANKARD was duly sworn by the Foreperson of the Grand Jury before he was asked any questions.

54. HANKARD was then given the following advisements, asked the following questions by the prosecutor and gave the following answers:

> Q. Mr. Hankard, you've been asked to testify before a special federal grand jury that is investigating potential allegations and violations of federal criminal law. Do you understand that?
>
> A. Yes, I do.
>
> Q. You've just been administered an oath by the foreperson of the grand jury and you've taken an oath and you've promised to tell the truth. Do you understand that?
>
> A. Yes.
>
> Q. If you should lie or knowingly make a false statement, you could be charged with the crime of perjury and, if you're found guilty, you could be imprisoned and fined. Do you understand that?
>
> A. Yes.

55. HANKARD was then asked a series of questions by the prosecutors and grand jurors about the events of March 26, 2014.

> Q. Now, directing your attention to March 26th, 2014, were you working on that day?
>
> A. No.
>
> Q. What were you doing on March 26th?
>
> A. Putting together an IKEA shelf at my apartment.
>
> Q. It probably took you some time to do that?
>
> A. Yeah, a couple of days.
>
> Q. Anything of note in your mind here today that occurred on March 26, 2014?
>
> A. I was putting together an IKEA shelf on my day off. I got a phone call from Detective [C.V.]. It was rather brief. He said that [W.J.] and his crew got hemmed up in something and he wanted to know if I had any toys or replicas. I was unsure of what he meant and I was like, what do you mean, [C.V.]? And he says do you have any of those, you know, replica or toy guns? I'm like, absolutely not, and then I hung up.
> It was literally a couple of seconds, the phone call. That was a weird call. I didn't think anything of it at the time. I had my suspicions, but nothing to me – nothing came about it.
>
> Q. When Detective [C.V.] said to you toys or replicas, what did you understand that to be in reference to?
>
> A. I didn't know at first. It was a surprising phone call and then – I'm pretty much the gadget guy in the unit, watches, guns, and they know I like BB guns. I'm like a big kid and I figured he meant a BB gun or one of those replica air soft guns.
>
> Q. Was Detective C.V. working at the time?
>
> A. Yes.

\* \* \*

> Q. When you said that you – I believe you testified that you had an idea of what that phone call meant. What was that idea of what you thought it meant?

11

> A. So when he said [W.J.] and his guys were hemmed up in something, I have my suspicion they wanted something to bring to the scene, a toy gun. I tried to block it out of my mind. I'm just one of those cops that I do everything by the book and I just didn't even want to think about it. I was off on my – once it's my day off, it's my day off; I want nothing to do with work.
>
> * * *
>
> Q. So you did not notify any of your superiors or anything that that call was made and that was suspicious?
>
> A. No, I didn't.
>
> Q. Why not?
>
> A. I just – like I said, I blocked it out. I want nothing to do with the incident. I had a suspicion what was going on but I did not have 100 percent knowledge of exactly what was going on.

56. At the end of his testimony, HANKARD was given the following admonishment by the prosecutor:

> Q. Seeing no other, questions, Detective Hankard, if after your testimony here you think of additional information that you would like to give to this grand jury, either to amend or supplement or clarify your testimony, you'll be given an opportunity to come back in here before this grand jury. You just need to let me know before they act on your testimony. Do you understand that, sir?
>
> A. I do.

57. At no time thereafter did HANKARD ask to return to the Grand Jury.

58. C.V. testified in the Grand Jury on the same day. Consistent with HANKARD's testimony, C.V. testified that he called HANKARD to see if he had a BB gun on March 26, 2014, but falsely told the Grand Jury that HANKARD had told him "no."

## The Charge

59. Between in or about March 26, 2014, and May 31, 2019, in the District of Maryland and elsewhere, the defendant,

**ROBERT HANKARD,**

did unlawfully, voluntarily, intentionally and knowingly conspire, combine, confederate, and agree with C.V., K.G., and others known and unknown to the Grand Jury, to commit offenses against the United States, that is, to:

a. knowingly conceal, cover up, falsify and make false entries in a record or document with the intent to impede, obstruct and influence the investigation and proper administration of that matter, a matter within the jurisdiction of the United States Department of Justice, a department and agency of the United States, or in relation to or contemplation of any such matter or case, in violation of 18 U.S.C. § 1519; and

b. knowingly make a false material declaration while under oath and testifying in a proceeding before a Grand Jury of the United States sitting in the United States District Court for the District of Maryland, in violation of 18 U.S.C. § 1623.

## Overt Acts

60. In furtherance of the conspiracy and to achieve its objects and purposes, members of the conspiracy committed the following overt acts, among others, in the District of Maryland and elsewhere:

    a. On March 26, 2014, HANKARD provided a BB gun to C.V. that was planted by K.G. at the scene of D.S.'s arrest.

    b. On or about March 2, 2015, HANKARD swore out a search warrant affidavit before a judge of the Circuit Court for Baltimore City that contained false

statements and material omissions related to the search of Apartment A at 15 Cross Keys Road.

c. Subsequent to the execution of the search warrant at Apartment A at 15 Cross Keys Road, HANKARD authored an "Incident Report" and "Supplement Report" with "CDS Violation" in box 1 of the report and bearing a complaint number ending in 478 describing the execution of the search warrant at Apartment A at 15 Cross Keys Road. These reports contained false statements and material omissions.

d. On or about September 25, 2015, HANKARD swore out a search warrant affidavit in front of a judge of the District Court for Baltimore City that contained numerous false statements and material omissions related to the arrest of D.B. and B.J., the search of D.B.'s pickup truck and the search of D.B.'s motel room.

e. Subsequent to the enforcement action that occurred on September 24-25, 2015, HANKARD authored and C.V. approved an "Incident Report" and "Supplement Report" describing the arrest of D.B. and B.J. and the search of D.B.'s pickup truck and motel room. These reports contained false statements and material omissions.

f. On February 13, 2019, HANKARD falsely testified before a federal Grand Jury sitting in Baltimore that when C.V. called him on March 26, 2014, and asked him if he had a BB gun, or words to that effect, and that he told him no.

18 U.S.C. § 371

## COUNT TWO
### (Conspiracy to Deprive Civil Rights)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs one through 12 and 31 through 47 of Count One are realleged and incorporated herein.

2. Between in or about March 26, 2014, and in or about May 31, 2019, in the District of Maryland and elsewhere, the defendant,

**ROBERT HANKARD,**

while acting under color of law, knowingly and willfully conspired and agreed with C.V. and K.G. and with other persons both known and unknown to the grand jury, to injure, oppress, threaten and intimidate citizens of Baltimore, including D.S. and D.B., in the free exercise of the rights secured to them by the Fourth and Fourteenth Amendments to the Constitution of the United States not to be subjected to unreasonable searches and seizures and not to be deprived of liberty without due process of law.

18 U.S.C. § 241

## COUNT THREE
**(Destruction, Alteration, or Falsification of Records in Federal Investigations)**

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs one through four and 31 through 47 of Count One are realleged and incorporated herein.

2. On or about September 25, 2015, in the District of Maryland and elsewhere, the defendant,

**ROBERT HANKARD,**

knowingly concealed, covered up and falsified and made false entries in a search warrant affidavit submitted to the District Court of Maryland for Baltimore City reflecting his actions, and the actions of his fellow Baltimore Police Department officers, in relation to the arrest of D.B. and B.J. and searches and seizures related to these arrests, with the intent to impede, obstruct and influence the investigation and proper administration of that matter, a matter within the jurisdiction of the United States Department of Justice, a department and agency of the United States, or in relation to or contemplation of any such matter or case.

18 U.S.C. § 1519

## COUNT FOUR
**(Destruction, Alteration, or Falsification of Records in Federal Investigations)**

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs one through four and 31 through 47 of Count One are realleged and incorporated herein.

2. On or about September 25, 2015, in the District of Maryland and elsewhere, the defendant,

**ROBERT HANKARD,**

knowingly concealed, covered up and falsified and made false entries in a Baltimore City Police Department "Incident Report" and "Supplement Report" reflecting his actions, and the actions of his fellow Baltimore Police Department officers, in relation to the arrest of D.B. and B.J. and searches and seizures related to these arrests, with the intent to impede, obstruct and influence the investigation and proper administration of that matter, a matter within the jurisdiction of the United States Department of Justice, a department and agency of the United States, or in relation to or contemplation of any such matter or case.

18 U.S.C. § 1519

## COUNT FIVE
### (False Declarations Before a Grand Jury)

The Grand Jury for the District of Maryland further charges that:

3. Paragraphs one through 12 and 48 through 58 of Count One are realleged and incorporated herein.

4. On or about February 13, 2019, in the District of Maryland, the defendant,

**ROBERT HANKARD,**

while under oath and testifying in a proceeding before a Grand Jury of the United States in the District of Maryland, knowingly did make a false material declaration, that is to say:

a. At the time and place aforesaid the Grand Jury was conducting an investigation to determine whether violations of Title 18, United States Code, Sections 371, 1512(b)(3) and 1519 had been committed, and to identify the persons who had committed, caused the commission of, and conspired to commit such violations. Specifically, the Grand Jury was investigating whether a BB gun had been planted at the scene of D.S.'s arrest on March 26, 2014. It was material to said investigation that the Grand Jury ascertain if a BB gun had been obtained by HANKARD, K.G., C.V., or anyone else on March 26, 2014.

b. At the time and place alleged, HANKARD, appearing as a witness under oath at a proceeding before the Grand Jury, knowingly made the following declarations in response to questions with respect to the material matter alleged above as follows:

> Q. Now, directing your attention to March 26th, 2014, were you working on that day?
>
> A. No.
>
> Q. What were you doing on March 26th?

A. Putting together an IKEA shelf at my apartment.

Q. It probably took you some time to do that?

A. Yeah, a couple of days.

Q. Anything of note in your mind here today that occurred on March 26, 2014?

A. I was putting together an IKEA shelf on my day off. I got a phone call from Detective [C.V.]. It was rather brief. He said that [W.J.] and his crew got hemmed up in something and he wanted to know if I had any toys or replicas. I was unsure of what he meant and I was like, what do you mean, [C.V.]? And he says do you have any of those, you know, replica or toy guns? I'm like, absolutely not, and then I hung up.

It was literally a couple of seconds, the phone call. That was a weird call. I didn't think anything of it at the time. I had my suspicions, but nothing to me – nothing came about it.

Q. When Detective [C.V.] said to you toys or replicas, what did you understand that to be in reference to?

A. I didn't know at first. It was a surprising phone call and then – I'm pretty much the gadget guy in the unit, watches, guns, and they know I like BB guns. I'm like a big kid and I figured he meant a BB gun or one of those replica air soft guns.

Q. Was Detective [C.V.] working at the time?

A. Yes.

\* \* \*

Q. When you said that you – I believe you testified that you had an idea of what that phone call meant. What was that idea of what you thought it meant?

A. So when he said [W.J.] and his guys were hemmed up in something, I have my suspicion they wanted something to bring to the scene, a toy gun. I tried to block it out of my mind. I'm just one of those cops that I do everything by the book and I just didn't even want to think about it. I was off on my – once it's my day off, it's my day off; I want nothing to do with work.

19

* * *

Q. So you did not notify any of your superiors or anything that that call was made and that was suspicious?

A. No, I didn't.

Q. Why not?

A. I just – like I said, I blocked it out. I want nothing to do with the incident. I had a suspicion what was going on but I did not have 100 percent knowledge of exactly what was going on.

c. The aforesaid quoted testimony of HANKARD, as he then and there well knew and believed, was false in that, on or about March 26, 2014, HANKARD told C.V. that he, HANKARD, did in fact have a BB gun, or words to that effect and HANKARD subsequently provided C.V. and K.G. with a BB gun..

18 U.S.C. § 1623

_____
ROBERT K. HUR
UNITED STATES ATTORNEY

A TRUE BILL:

8/11/2020
Date

SIGNATURE REDACTED
Foreperson